IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 22, 2010

## RODNEY BUFORD v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2003-C-2109      Mark J. Fishburn, Judge**

**No. M2009-01740-CCA-R3-PC - Filed April 19, 2011**

Petitioner, Rodney Buford, appeals the dismissal of his petition for post-conviction relief in which he alleged that he received ineffective assistance of trial counsel because counsel failed to obtain a medical expert to testify at trial and failed to file a motion to suppress his statement to police. He further argues that appellate counsel was deficient for failing to challenge the sufficiency of the evidence on appeal and that the trial court erred by not finding that he was illegally sentenced. After a thorough review of the record, we conclude that Petitioner has failed to show that his trial counsel rendered ineffective assistance of counsel and affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which JERRY L. SMITH and J.C. MCLIN, JJ., joined.

David Hopkins, Nashville, Tennessee, for the appellant, Rodney Buford.

Robert E. Cooper, Jr., Attorney General and Reporter; Leslie E. Price, Assistant Attorney General; Victor S. (Torry) Johnson, III,  District Attorney General; and Sarah Davis, Assistant District Attorney General, for the appellee, the State of Tennessee.

### OPINION

## I.  Background

Following a jury trial, Petitioner was convicted of especially aggravated robbery and aggravated burglary. He was sentenced to consecutive sentences of twenty-five years for especially aggravated robbery and six years for aggravated burglary. On appeal, this Court affirmed the convictions and sentences. *State v. Rodney Buford*, No. M2004-01568-CCA-

R3-CD, 2005 WL 2333616 (Tenn. Crim. App. Sept. 22, 2005) *perm. app. denied* (Tenn., Feb. 21, 2006). The facts surrounding Petitioner's convictions were summarized by this Court on direct appeal as follows:

> At approximately 1:30 a.m. on May 25, 2003, the victim, seventy-seven year old Mildred Holmes, awoke and realized that she had forgotten to take her medicine. After taking her medicine, the victim turned off the lights and was returning to bed when her doorbell rang. Ms. Holmes looked through the peephole and recognized the Appellant, whom she had known for several years through her close friendship with the Appellant's grandmother. Ms. Holmes agreed to let the Appellant inside to use the telephone to call his grandmother who he claimed had accidentally locked him out of the house. Upon entering, the Appellant went to the kitchen, under the pretense of making a phone call, while the victim waited in the dining room. Afterwards, Ms. Holmes followed the Appellant to the front door, intending to lock the door behind him. When the Appellant was almost to the front door, he turned to the victim and put her in a "bear-hug," telling her that he wanted her money and car keys. When the victim began to struggle, the Appellant told her "don't make me kill you." The victim testified that at one point the Appellant reached underneath her nightgown and began to remove her underwear but stopped after she told him she had recently undergone surgery.
>
> The two returned to the dining room area, and the victim gave the Appellant approximately $50 in cash and her car keys. The Appellant then picked up a glass ornament in the shape of an apple and began hitting the victim in the head. The victim lost consciousness a couple of times during the assault. At one point, the victim regained consciousness and saw the Appellant washing his hands. When he realized that she was conscious, he returned to her, picked up the glass apple, and resumed hitting her in the head. At some point during the attack, the Appellant tied the victim up with ribbon and a calculator cord. The Appellant eventually left the residence, taking the victim's 1994 Honda.
>
> When the victim discovered that the Appellant was gone, she freed herself from the bindings and called 911. She was conscious and alert when the officer arrived and was able to give the Appellant's name and relate the events. Emergency personnel arrived and began treatment of the victim's gushing head wound. She was transported to the hospital by ambulance where it was discovered that, in addition to multiple contusions and lacerations, she had sustained a torn artery in her head, which required immediate suturing in order to stop the bleeding. Had the bleeding not been stopped immediately, the victim's life would have been in danger. The victim also received additional

-2-

stitches, sutures, and staples to her other various injuries. Two days later, she returned to the emergency room, complaining of severe pain in her wrist and hand. A medical examination revealed that she had cellulitis, an infection of the skin, which developed from the assault.

The Appellant was later arrested in a motel after pawning the victim's car for crack cocaine. Following his arrest, the Appellant gave a statement to the police confessing his involvement in the crimes. The Appellant explained that, at the time of the crimes, he had been smoking crack cocaine.

*Id*. at *1-2.

## II. Post-Conviction Hearing

Petitioner testified that he met with trial counsel "maybe" four or five times before trial, and the majority of their discussions involved plea offers. He said that after trial counsel realized that he was not going to take a plea, they began discussing trial strategy. Petitioner said that he did not meet the co-counsel until the morning of trial, and they also did not discuss trial strategy. He understood the defense to be that the victim did not suffer serious bodily injury. Petitioner admitted that during one of the meetings with trial counsel, she reviewed the victim's medical records with him. He also mailed the records to his aunt, who worked with medical records, for review. He said that the medical records were made an exhibit at trial, and there was medical proof concerning the extent of the victim's injuries. Petitioner testified that he and trial counsel did not discuss obtaining a medical expert to testify on his behalf, and he was not sure how trial counsel rebutted the State's proof regarding the victim's injuries. However, he admitted that trial counsel did call a paramedic to testify. Petitioner claimed that trial counsel left him "in the dark" concerning his defense. He testified that on the morning of trial, counsel made a motion for a bill of particulars, which was denied by the trial court.

Petitioner testified that he made a statement to police after his arrest, which was admitted as evidence during the trial. In the statement, Petitioner admitted that he entered the victim's house, had an altercation, and took some items that belonged to her. He and trial counsel discussed the statement, and he told her that he had been "smoking crack and drinking alcohol leading up to before that I gave that statement." Petitioner also said that he had been up for three or four days and was exhausted at the time. He believed that he was still under the influence of the drugs and alcohol when he gave the statement; however, trial counsel did not file a motion to suppress, and "basically just blew [him] off." Petitioner also claimed that because of his intoxication, he did not completely understand the waiver of rights that he signed and did not understand that the statement would be used against him at trial.

-3-

Petitioner testified that he never met with appellate counsel, but had five or six telephone conversations with her. They also corresponded by mail. He said that trial counsel raised sufficiency of the evidence in the motion for new trial, but appellate counsel did not include the issue in the appellate brief. Petitioner testified that he discussed the issue with appellate counsel, and asked her to include it in the brief. However, she told him that "she had asked around with some of her colleagues and she felt like it wasn't a good issue to raise . . ."

Petitioner testified that his sentencing hearing was held on March 26, 2004, and he received the maximum sentences as a Range One offender for his convictions. The sentences were ordered to be served consecutively. Petitioner testified that trial counsel raised the issue of *Blakely* in the motion for new trial, and appellate counsel also included the issue in the appellate brief. He said:

> Prior to my ruling on direct appeal the United States Supreme Court had came, I mean, Tennessee Supreme Court had came down with their ruling in *Gomez* denying me relief for *Blakely* so, no, I didn't get any relief on that issue.

Petitioner testified that the *Blakely* issue was also included in his Rule 11 application to the Tennessee Supreme Court. He noted that since his direct appeal, the Tennessee Supreme Court issued its decision in "*Gomez II*," and after reading the case, he felt that he should "be given some relief on that issue." Petitioner also claimed that the imposition of consecutive sentences was unconstitutional based on *Gomez II.*

On cross-examination, Petitioner testified that his defense was that the victim did not suffer serious bodily injury. He claimed that that he really did not discuss trial strategy with trial counsel; however, he knew what his defense would be. He agreed that strategy was trial counsel's decision. Petitioner testified that he met with trial counsel four or five times before trial, and they communicated by mail a couple of times. Trial counsel also spoke with his family by telephone because Petitioner was in the "hole" at the time, and it was difficult for him to "get to a phone a lot."

Petitioner testified that he felt an expert should have been called on his behalf to testify concerning the victim's injuries; however, he admitted that he never specifically asked trial counsel to call an expert. He agreed that trial counsel showed the medical records to him, and they reviewed them together. They discussed areas where they felt that there were deficiencies in the medical records which would support his contention that the victim did not suffer serious bodily injury. Petitioner admitted that he was not sure what an expert would have said, and there was no guarantee that an expert would have said something different than the State's expert. He did not know why trial counsel called a paramedic to

testify at trial, but he  said that it was not to rebut expert testimony concerning the victim's injuries.

Petitioner testified that he was mirandized prior to giving a statement, and detectives extensively reviewed his rights with him before the interview. However, he did not knowingly and voluntarily waive his rights because he was under the influence of drugs and alcohol at the time.  Petitioner admitted that he gave a very detailed statement of what happened, and he explained in detail how he tricked the victim to get into her house, robbed her, and then fled the scene.  Petitioner testified that he and trial counsel discussed filing a motion to suppress, and she told him that it was not necessary or appropriate.

Petitioner testified that he communicated with appellate counsel several times by phone and by mail.  She kept him apprised of what was going on with his appeal and the issues that she was going to include in the appeal.  He said that they discussed sufficiency of the evidence, and appellate counsel told him that based on his testimony, she did not feel that the issue should be raised.  He agreed that the issue of *Blakely* was raised on appeal in both the appellate brief and in the Rule 11 application to the Tennessee Supreme Court. Petitioner acknowledged that the Court of Criminal Appeals found that *Blakely* did not apply in his case.

Trial counsel testified that she was assisted at trial by another member of the Public Defender's Office.  Concerning her meetings with Petitioner, trial counsel said:

> I originally met [Petitioner] my notes reflected back in May in 2003 when he had just been arrested and we had a preliminary hearing, so that was the initial meeting where we discussed the case, discussed what happened and I went in and discussed ranges of punishment and what those crimes carried and at the time what I thought an indictment may reflect on any additional crimes that may be charged so we had had discussions about that.
>
> My notes also reflect and he was correct he was in the hole for quite some time and I later filed a bond reduction just to get it under $100,000 to allow him to get out of the hole, so our conversations went for a [sic] about a period of four months where we did not get to meet or really talk unless it was a court appearance, so I mean according to my notes I talked with his aunt quite some, quite a bit [sic] Annette Buford.  Back in September, I visited with him September 10, 2003.
>
> I talked with his aunt again on the 16th of September, discussed I think he may have called me on the 17th of September.  We were in Court on October 8.  We were in Court October 16th.  We were in Court November 25.  We were in

Court [sic] December.  I also went to personally go and visit him in January and that was probably after [sic] the trial - - starting to prepare for the trial and I also visited him the 5th of Sep - - the 5th of February 2004.

I also show that we were in court probably in pretrial conference stage on the 13th of February and then that week of the 23rd which was his trial week of 2004 I at least met with him two at least two times, just as a minimum.  I always will go the Friday before trial, that Friday will go and visit a client and usually I will double back with that Saturday or Sunday, just getting everything together and making sure they, they understand everything in preparation for the trial.

However, [Petitioner] and I did talk about the suppression motion.  I did not think that that was a valid motion.  We had looked at the videotape of his confession and I did not - - I did not file a motion to suppress.  He did say that he was under the influence, but in my mind just because you are under the influence does not mean that you can't voluntarily waive your rights so I did not file that motion on his behalf.

I did not have any knowledge or I do not remember any knowledge that he had been up three or four days in addition to the drugs and alcohol.  We filed motions in limine that was pretrial in preparation of the case.  We also had an investigator in our office.  He was assigned to our division Miguel Corez.  I have notes where I had him do some additional work on that case just gathering things together.

Trial counsel testified that she was able to speak with Petitioner more frequently after she filed a motion to have his bond reduced, and he was taken out of the "hole."  She said that she had a good relationship with Petitioner, and he was cooperative. He was also free to voice any concerns, and she would explain anything that he did not understand.  Trial counsel and Petitioner discussed the facts of the case and a plea bargain.  Trial counsel felt that it was in Petitioner's best interest to "at least entertain a plea bargain" because he was charged with three indictments, and he also had another sentence.  She was sure that they discussed a motion to suppress on more than one occasion.  Trial counsel said that she told Petitioner that she would not file a motion to suppress, and she explained why.  She could not recall if Petitioner told her that he had been using crack cocaine for three days straight prior to giving a statement.  She said:

I did not feel that [Petitioner], I thought that he knew exactly what he was doing.  He may have had some alcohol and some drugs in his system but I thought that he understood what was going on and clearly shortly, you know,

-6-

no questions, he never, he didn't ask any questions but shortly just reading the transcript after asking those preliminary questions about the [*Miranda*] rights and what he was entitled to. He shortly, immediately pretty much, went into saying that he didn't have any excuses for what he done, what he had done. [Petitioner] was extremely sympathetic about the acts that he had committed because he had a long-term relationship with the neighbor. He knew her, you know, he had grown up with her. I think that things just got out of control and he was very sympathetic. He felt sorry for what he had done.

Trial counsel testified that she, as well as an investigator, interviewed the EMT who treated the victim, and they attempted to interview the treating physician, who was not very cooperative. The EMT was called to testify because the trial strategy was that the victim suffered no serious bodily injury, and "from his report and his recollections he did not see any serious bodily injury just from his observations and he was the first one on the scene to provide some aid or assistance to Ms. Holmes at that time." The EMT also indicated that the victim was stable and alert. Trial counsel was sure that she and co-counsel discussed the defense strategy with Petitioner prior to trial because that was her standard practice and habit.

Trial counsel testified that Petitioner had "pretty much" confessed to the burglary and robbery. She thought that she reviewed the victim's medical records with Petitioner, and he sent them to his aunt who was in the medical profession. She said that she and co-counsel did not entertain the possibility of calling an expert witness because the victim's medical records did not show any serious bodily injury, and she was released a few hours after arriving at the hospital. However, they later learned of the victim's issues with "the blood and the artery that had been cut . . ." Trial counsel was not sure if they could have found an expert who would have testified differently than the State's expert. In attacking the serious bodily injury prong, trial counsel testified that she filed a motion for a bill of particulars on the morning of trial. The motion was heard and denied.

On cross-examination, trial counsel testified that although she had no formal medical training, she did not see anything in the victim's medical records to indicate serious bodily injury. She said that the victim was released within a couple of hours after arriving at the emergency room, and there was the factor of "protracted consciousness." Trial counsel testified that the strategy to show there was no serious bodily injury was to call the EMT to testify and to cross-examine the State's expert. She said that there was no objection to the EMT's testimony or any of his observations. Trial counsel testified that there was some testimony about the victim developing cellulitis in her hand; however, that was not in the medical records because it was a condition that developed later. She did not recall any discussions about a medical expert, and she did not ask the trial court for funds to obtain an expert. Trial counsel also said:

The doctor testified to my recollection that one of the major issues with Ms. Holmes that was not located in her medical records that they had to stop some serious bleeding that there was something a cut or laceration to a major artery in her head and she had a lot of bleeding and it could have pretty much put her life in serious jeopardy.

We did not have privy [sic] to that from the medical records, but if that is his testimony and that is what happened I guess I meant to say that if we had found a medical expert it probably wasn't going to rebut the finding that the attending physician found as well.

Trial counsel testified that she and co-counsel attempted to contact the treating physician several times but were unsuccessful. They did not bring the matter to the trial court's attention or try to subpoena the doctor. However, co-counsel cross-examined him at trial.

On redirect, trial counsel testified that the State had several theories to show serious bodily injury. In addition to a substantial risk for death, the State also attempted to show extreme pain through the victim's testimony. Trial counsel acknowledged that a motion in limine was filed requesting that "no testimony be elicited connecting current health problems between the victim [sic] that the victim had to the crime unless there [was] specific medical testimony to that fact."

Appellate counsel testified that she could not recall how many times she communicated with Petitioner by phone or by mail, but she spoke with him "often enough that [she] had a good sense of what his concerns were about - - about the case and [they] had an opportunity to do these back and forth exchanges about [their] thoughts and ideas." Appellate counsel testified that she and Petitioner discussed sentencing issues, and various other issues to raise on appeal. They also discussed a motion for new trial, and she made certain that Petitioner had a "complete record of everything that had transpired." Appellate counsel testified that she and Petitioner had a lot of communication both during and after the preparation of her brief, and they discussed a Rule 11 application after this Court affirmed the trial court.

Appellate counsel agreed that her main focus on appeal was: (1) that the State should have been required to file a bill of particulars, and (2) the Court's application of the 1989 Criminal Sentencing Reform Act as well as *Blakely* sentencing issues.

Appellate counsel testified that she and Petitioner discussed whether to include an issue concerning sufficiency of the evidence on appeal. She received a letter from Petitioner concerning the matter, and they later discussed it by phone. Appellate counsel thought that the conversation took place after she filed the brief, but did not recall the particulars of the

conversation. She thought that they reviewed each issue in the brief and any of Petitioner's other concerns. Appellate counsel testified that sufficiency of the evidence is "very much of a default issue." Although she could not specifically recall why she did not raise the issue in Petitioner's case, she speculated that it was because it might have detracted from the other issues which she felt had merit. Appellate counsel agreed that her decision not to include the issue would have been a strategical decision.

On cross-examination, appellate counsel testified that she thought *Blakely* had not been decided at the time of Petitioner's trial, but she raised the issue on appeal. She said that while the Petitioner's case was on appeal, *Gomez I* was decided by the Tennessee Supreme Court, and this Court declined to find merit in the *Blakely* issue. The sentencing issues were then addressed under the 1989 Sentencing Act. She later filed a Rule 11 application that was denied, and *Gomez II* was decided by the Tennessee Supreme Court after the denial. Appellate counsel testified that Petitioner sent her a letter after the brief was filed asking why she did not raise sufficiency as to the serious bodily injury issue. She did not recall if she considered asking for leave to file an amended brief, and she did not file a reply brief.

## III. Standard of Review

A petitioner seeking post-conviction relief must establish his allegations by clear and convincing evidence. T.C.A. § 40-30-210(f). The trial court's application of the law to the facts is reviewed *de novo,* without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). A claim that counsel rendered ineffective assistance is a mixed question of fact and law and therefore also subject to *de novo* review. *Id*.; *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must establish that counsel's performance fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose,* 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he must show that counsel's ineffective performance actually adversely impacted his defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S.Ct. 2052, 2067, 80 L.Ed.2d 674 (1984). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Id.* at 690, 104 S.Ct. at 2066.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). That is, a petitioner must not only show that his counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. *Id.* Failure to satisfy either prong will result in the denial of relief. *Id.* Accordingly, this Court need not address one of the components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069.

### A. *Failure to Obtain a Medical Expert to Testify at Trial*

Petitioner first argues that trial counsel was ineffective for failing to obtain a medical expert to testify concerning the victim's injuries. However, as pointed out by the State, Petitioner failed to present such a witness at the post-conviction hearing. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witness should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Accordingly, Petitioner has failed to establish any prejudice.

Moreover, Petitioner has not shown that trial counsel was deficient in this area. In considering this issue, the post-conviction court noted:

> In light of the overwhelming evidence of guilt including the Defendant's confession, defense counsel did not have a lot of alternative strategies from which to choose. Her effort to focus on creating reasonable doubt on the element of serious bodily injury was most reasonable. The real question is not the defense itself, but whether an expert was reasonably required to successfully argue the defense strategy. This court thinks not.

> Ms. Montgomery had available from actual witnesses who treated Ms. Holmes evidence that supported the defense position that the injuries suffered were not serious. The paramedic testified that her vital signs were normal; she was in no apparent distress; and she was alert and oriented. The hospital admission report gave no indication of the seriousness of her injuries.

> Arguably Ms. Montgomery should have taken measures to insure that she had available all of the records relating to Ms. Holmes' medical treatment. And it may have been prudent to have had the medical records reviewed by an expert to insure that they were properly interpreted.

The post-conviction court concluded that there was nothing before it to show that the outcome of the trial would have been any different, and no evidence had been presented to

contradict the testimony of the State's expert witnesses. The post-conviction court further noted:

> Except as to causation, the law does not require expert medical testimony to establish that an injury is serious. The victim herself is permitted to and did testify to the effects this assault had on her. Ms. Montgomery presented to the jury legitimate medical evidence which would tend to refute these claims. The fact that the strategy was not successful does not mean that it was ineffective. *Good v. State*, 938 S.W.2d 363, 369 (Tenn. 1996).

The record in this case does not preponderate against the post-conviction court's findings. Trial counsel testified that she, as well as an investigator, interviewed the EMT who treated the victim. The EMT was called to testify because the trial strategy was that the victim suffered no serious bodily injury, and "from his report and his recollections he did not see any serious bodily injury just from his observations and he was the first one on the scene to provide some aid or assistance to Ms. Holmes at that time." The EMT also indicated that the victim was stable and alert. Trial counsel and Petitioner reviewed the victim's medical records, and he sent them to his aunt who was in the medical profession. Trial counsel testified that she and co-counsel did not entertain the possibility of calling an expert witness because the victim's medical records did not show any serious bodily injury, and she was released a few hours after arriving at the hospital.

### B. Failure to File a Motion to Suppress

Petitioner next contends that trial counsel was ineffective for failing to file a motion to suppress his statement to police. The post-conviction court noted that trial counsel reviewed the videotape of the statement and concluded that there was nothing to corroborate Petitioner's claim that he had been using cocaine before giving the statement and did not understand the consequences of waiving his rights. The post-conviction court also noted that it had reviewed the tape and "did not observe that the [Petitioner] was under the influence of a substance that would suggest he did not understand the implications of waiving his rights." The court found that there was nothing in the record to show that a motion to suppress would have been granted.

The record in this case does not preponderate against the post-conviction court's findings. Trial counsel was sure that she and Petitioner discussed a motion to suppress on more than one occasion. She told Petitioner that she would not file the motion and explained why. Although trial counsel could not recall if Petitioner told her that he had been using crack cocaine for three days straight prior to giving a statement, she felt that Petitioner "knew exactly what he was doing," and he understood what was going on.

We conclude that Petitioner has failed to show that trial counsel's assistance in this asserted ground fell below acceptable standards or that Petitioner was prejudiced by any aspect of his trial counsel's assistance on this ground. Petitioner is not entitled to relief on this issue.

*C. Failure to Challenge the Sufficiency of the Convicting Evidence on Appeal*

Third, Petitioner contends that appellate counsel was ineffective for failing to challenge the sufficiency of the evidence on appeal. The same principles apply in determining the effectiveness of both trial and appellate counsel. *Campbell v. State*, 904 S.W.2d 594, 596 (Tenn. 1995). An appellate attorney is neither duty bound nor required to raise every possible issue on appeal. *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004)(citing *King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999); *Campbell*, 904 S.W.2d at 596-97.

To show that counsel was deficient for failing to raise an issue on direct appeal, the reviewing courts must determine the merits of the issue. *Carpenter*, 126 S.w.3d at 887 (citing *Kimmelman*, 477 U.S. at 375, 106 S.Ct. at 2574). Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. *Id.* Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. *Id.* When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim. *Carpenter*, 126 S.W.3d at 888 (citation omitted). In fact, "ineffectiveness is very rarely found in cases where a defendant asserts that appellate counsel failed to raise an issue on direct appeal, primarily because the decision of what issues to raise is one of the most important strategic decisions to be made by appellate counsel." *Kennath Henderson v. State*, No. W2003-01545-CCA-R3-PD, 2005 WL 1541855, at *44 (Tenn. Crim. App. June 28, 2005), perm. app. denied (Tenn. Dec. 5, 2005).

In this case, the post-conviction court considered the sufficiency issue and found:

> Although there was conflicting evidence regarding the seriousness of the injuries inflicted, the jury heard the evidence, weighed it and determined that the injuries constituted serious bodily injury. It is within the province of the jury to resolve disputed facts and they fulfilled that obligation.

The record supports the trial court's findings. Appellate counsel testified that her main focus on appeal was that the State should have been required to file a bill of particulars, and she also challenged Petitioner's sentence. Her brief focused on the issues that had the most "traction." Appellate counsel testified that sufficiency of the evidence is "very much of a default issue," and she speculated that she did not raise the issue in Petitioner's case

because it might have detracted from the other issues which she felt had merit. Appellate counsel agreed that her decision not to include the issue would have been a strategical decision.

We conclude that Petitioner has failed to show that appellate counsel's assistance fell below acceptable standards or that Petitioner was prejudiced by any aspect of counsel's assistance. Petitioner is not entitled to relief on this issue.

*D. Failure to the trial court to find that Petitioner was illegally sentenced*

Finally, Petitioner contends that the trial court erred by not finding that his sentence was illegal because it was enhanced based on factors not found by the jury or admitted by the Petitioner in violation of *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004) and *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S.Ct. 2348, 2362-63, 147 L.Ed.2d 435 (2000). However, as pointed out by the post-conviction court and the State, this issue was previously determined because it was raised and addressed on direct appeal. Concerning the issue of an illegal sentence, this Court held:

> The Appellant challenges only the application of enhancement factor (5), that the victim was particularly vulnerable because of age or physical or mental disability. Additionally, the Appellant asserts that the sentences imposed are in conflict with *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), based upon the application of certain enhancement factors without jury findings or admissions.

> We note initially that the *Blakely* issue has been rendered moot by the Tennessee Supreme Court's recent decision in *State v. Gomez,* 163 S.W.3d 632, (Tenn.2005). Our supreme court held that the 1989 Sentencing Reform Act "authorizes a discretionary, non-mandatory sentencing procedure ... [which] sets out broad sentencing principles, enhancement and mitigating factors, and a presumptive sentence, all of which serve to guide trial judges in exercising their discretion to select an appropriate sentence within the range set by the Legislature. Under the Reform Act, the finding of an enhancement factor does not mandate an increased sentence." *Id.* at 661. Accordingly, the court held that the Tennessee Sentencing Reform Act does not violate the Sixth Amendment guarantee of a jury trial and is, thus, not affected by the *Blakely* decision. *Id.* Thus, the Appellant is not entitled to relief under *Blakely*.

*Buford*, 2005 WL 2333616, at *5. It is well-established that post-conviction proceedings may not be employed to raise and re-litigate issues previously determined on direct appeal. *See* T.C.A. § 40-30-106(f)(2006); *Miller v. State*, 54 S.W.3d 743, 747-48 (Tenn. 2001).

Moreover, this Court has previously held that *Blakely*, *Apprendi*, ,and their progeny do not apply retroactively to cases on collateral appeal. *See Billy Merle Meeks v. Ricky J. Bell, Warden*, No. M2005-00626-CCA-R3-HC, 2007 Tenn. Crim. App. LEXIS 962, at *17, 2007 WL 4116486 (Tenn. Crim. App., Nashville, Nov. 13, 2007), *perm.* to *appeal* den. (Tenn. Apr. 7, 2008); *Timothy R. Bowles v. State,* No. M2006-01685-CCA-R3-HC, 2007 WL 1266594, at *2-3 (Tenn. Crim. App., at Nashville, May 1, 2007), *no perm. appeal filed; Carl Johnson v. State*, No. W2003-02760-CCA-R3-PC, 2005 WL 181699, at * 11-12 (Tenn. Crim. App., Jan. 25, 2005), *perm. app. denied* (Tenn. June 27, 2005). Accordingly, we conclude that Petitioner is not entitled to relief on this ground.

## CONCLUSION

After a thorough review, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE